UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROME L. MCINTYRE, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 4:18-cv-0273 |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMAND |
| v. | § | |
| | § | |
| CHICAGO BRIDGE & IRON COMPANY N.V., MARSHA C. WILLIAMS, L. RICHARD FLURY, WESTLEY S. STOCKTON, LARRY D. MCVAY, W. CRAIG KISSEL, DEBORAH M. FRETZ, JAMES R. BOLCH, JAMES H. MILLER, TRAVIS L. STRICKER, FORBES I. J. ALEXANDER, LUCIANO REYES, and JOHN R. ALBANESE, | § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a)
AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Rome L. McIntyre ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.     This action is brought as a class action by Plaintiff on behalf of himself and on behalf of all other similarly situated public common stockholders of Chicago Bridge & Iron Company N.V. ("CB&I" or the "Company") against the Company, Marsha C. Williams, L. Richard Flury, Westley S. Stockton, Larry D. McVay, W. Craig Kissel, Deborah M. Fretz, James R. Bolch, James H. Miller, Travis L. Stricker, Forbes I.J. Alexander, Luciano Reyes, and John R.

Albanese, the members of CB&I's board of directors (collectively referred to as the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 in connection with acquisition of CB&I by McDermott International, Inc. ("McDermott") through a merger transaction as alleged in detail herein (the "Proposed Transaction").

2.      On December 18, 2017, CB&I and McDermott issued a joint press release announcing the execution of a business combination agreement (the "Merger Agreement") providing for the combination of CB&I and McDermott in a stock-for-stock transaction. Pursuant to the terms of the Merger Agreement, CB&I stockholders will receive 2.47221 shares of McDermott common stock in exchange for each share of CB&I they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $6 billion.  Furthermore, each share of CB&I common stock has an implied value of $18.76 as of December 18, 2017, which amounts to a ***mere 4.76% premium*** over CB&I's closing share price of $17.92.[1]

3.      On January 23, 2018, in order to convince CB&I's stockholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) financial projections for CB&I; (ii) financial projections for McDermott; (iii) financial projections for the operating synergies projected to result from the Proposed

---

[1] *Merger Doesn't Impact Value Proposition For Chicago Bridge & Iron*, SEEKING ALPHA (Dec. 19, 2017), *available at* https://seekingalpha.com/article/4132840-merger-impact-value-proposition-chicago-bridge-and-iron.

Transaction (the "Synergies"); (iv) the valuation analyses performed by the CB&I's financial advisor, Centerview Partners LLC ("Centerview"), in support of their fairness opinions; (v) the valuation analyses performed by the McDermott's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Greenhill & Co., LLC ("Greenhill," and together with Goldman Sachs "McDermott's Financial Advisors"), in support of their fairness opinions; and (vi) the background process leading to the Proposed Transaction.

5.      The special meeting of CB&I stockholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's public common stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to CB&I's stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event that the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## PARTIES

7.      Plaintiff is, and has been at all relevant times, a stockholder of CB&I common stock.

8.      Defendant CB&I provides designing, engineering, construction, fabrication, maintenance, and environmental services.  The Company builds and repairs bulk liquid terminals, storage tanks, process vessels, and low temperature and cryogenic storage facilities.

CB&I offers its services worldwide to the oil and gas, infrastructure, wastewater, and power industries.  CB&I is a public company with limited liability incorporated under the laws of the Netherlands and its principal office is located at One CB&I Plaza, 2103 Research Forest Drive, The Woodlands, Texas, 77380.  CB&I common stock trades on the NYSE under the symbol "CBI."

9.     Defendant Marsha C. Williams is, and has been since 2017, a director of the Company.

10.     Defendant L. Richard Flury is, and has been since 2017, a director of the Company.

11.     Defendant Westley S. Stockton is, and has been since 2017, a director of the Company.

12.     Defendant Larry D. McVay is, and has been since 2017, a director of the Company.

13.     Defendant W. Craig Kissel is, and has been since 2017, a director of the Company.

14.     Defendant Deborah M. Fretz is, and has been since 2017, a director of the Company.

15.     Defendant James R. Bolch is, and has been since 2017, a director of the Company.

16.     Defendant James H. Miller is, and has been since 2017, a director of the Company.

17.     Defendant Travis L. Stricker is, and has been since 2017, a director of the Company.

18.     Defendant Forbes I. J. Alexander is, and has been since 2017, a director of the Company.

19.     Defendant Luciano Reyes is, and has been since 2017, a director of the Company.

20.     Defendant John R. Albanese is, and has been since 2017, a director of the Company.

21.     The parties in paragraphs 9 through 20 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with CB&I, "Defendants."

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

23.     This Court has jurisdiction over Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  CB&I is incorporated in the Netherlands and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Rockwell (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

a)      the Class is so numerous that joinder of all members is impracticable.  As of October 19, 2017, there were approximately 101.39 million shares of CB&I common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of CB&I will be ascertained through discovery;

b)      there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

    ii.     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the

Proposed Transaction based on the materially incomplete and misleading S-4.

c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d) Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class;

e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**SUBSTANTIVE ALLEGATIONS**

**I. Company Background and the Proposed Transaction**

27. CB&I, incorporated in 1889, provides a range of services to customers in the energy infrastructure market across the world. The Company provides various services, such as conceptual design, technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services,

and provides various Government services.  CB&I operates through three segments: Engineering and Construction, Fabrication Services, and Technology.

28.    On December 18, 2017, CB&I and McDermott issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**McDermott and CB&I to Combine in Transaction Valued at $6 Billion**

*Creates a fully vertically integrated onshore-offshore EPCI company with a broad service offering and market leading technology portfolio*

*Combined company to be a global leader with a complementary geographic portfolio and a strong presence in high-growth developing regions*

*Significant scale with combined revenues of approximately $10 billion[i] and backlog of approximately $14.5 billion[ii]*

*McDermott shareholders to own 53% and CB&I shareholders to own 47% of the combined company*

*Expected to be cash accretive, excluding one-time costs, within first year after closing with annualized cost synergies of $250 million expected in 2019 and substantial revenue synergies*

*Transaction encompasses CB&I's Technology business*

HOUSTON and THE WOODLANDS, Texas – December 18, 2017 – McDermott International, Inc. (NYSE:MDR) and CB&I (NYSE:CBI) today announced that the companies have agreed to combine in an all-stock transaction to create a premier fully vertically integrated onshore-offshore company, with a broad engineering, procurement, construction and installation ("EPCI") service offering and market leading technology portfolio.

Upon completion of the transaction, McDermott shareholders will own approximately 53 percent of the combined company on a fully diluted basis and CB&I shareholders will own approximately 47 percent.  Under the terms of the business combination agreement ("BCA"), CB&I shareholders will be entitled to receive 2.47221 shares of McDermott common stock for each share of CB&I common stock owned (or 0.82407 shares if McDermott effects a planned three-to-one reverse stock split prior to closing), subject to any withholding taxes.  The estimated enterprise value of the transaction is approximately $6 billion, based on the closing share price of McDermott on December 15, 2017.

"Customers worldwide increasingly seek a single company that can offer end-to-end solutions, and the combination of McDermott and CB&I responds to these evolving customer needs by creating a leading vertically integrated company," said David Dickson, President and Chief Executive Officer of McDermott. "This transaction combines two highly complementary businesses to create a leading onshore-offshore EPCI company driven by technology and innovation, with the scale and diversification to better capitalize on global growth opportunities. McDermott has been on a three-year journey that has transformed our company and created a model for delivering sustainable and profitable growth that we believe will unlock value in the near and long term. By applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture. We have great respect for the CB&I team and look forward to working with them to realize significant benefits for our combined shareholders, customers and employees."

"The combination with McDermott maximizes value for shareholders and provides the opportunity to participate in significant upside potential as we create a premier vertically integrated engineering, procurement, fabrication, construction and installation provider with significant scale, diversification and global presence," said Patrick K. Mullen, CB&I President and Chief Executive Officer. "Together, we will have a broadened reach across the entire energy industry that addresses evolving customer needs, along with a much stronger and more flexible financial profile than CB&I would independently, which will benefit all our stakeholders. This unique opportunity to combine with McDermott was presented as we pursued the sale of our Technology and former Engineered Products businesses. Our Supervisory and Management Boards and our management team reviewed multiple strategic options and we ultimately decided this transaction is the best path forward and in the best interest of CB&I, and its shareholders and other stakeholders."

### **Highly Compelling Strategic and Financial Rationale**

- **Complementary global portfolio and an established presence in high-growth markets.** This combination will unite McDermott's established presence in the Middle East and Asia with CB&I's robust operations in the United States, creating a balanced geographic portfolio with a strong position in high growth developing regions. Further, the combination will create significant opportunities to capture additional value from market trends across the entire value chain. Together, McDermott and CB&I will have a presence across onshore and offshore, upstream, downstream and power markets, enhancing competitiveness and enabling more consistent, predictable performance through market cycles.

- **Greater ability to respond to evolving customer needs.** The combined company will offer customers engineered and constructed facility solutions

and fabrication services across the full lifecycle, executed to maximize asset value.  Customers will also benefit from enhanced exposure across diverse end markets, including refining, petrochemicals, LNG and power.

- Enhanced financial profile to support growth.  The combined company is expected to have a strong capital structure.  On a pro forma combined basis, McDermott and CB&I would have combined revenues of approximately $10 billion[i] and a backlog of approximately $14.5 billion[ii].  The combined company is expected to generate EBITDA growth and strong free cash flow, enabling it to rapidly de-lever.

- **Leverages CB&I's strong technology capabilities.**  By retaining CB&I's Technology business, with its 3,000 patents and patent application trademarks and more than 100 licensed technologies, the combined company will be one of the world's largest providers of licensed process technologies.  McDermott and CB&I anticipate leveraging these capabilities across their customer base to drive follow-on work.

- **Cash accretive with opportunities for cost and revenue synergies.**  The transaction is expected to be cash accretive, excluding one-time costs, within the first year after closing.  It is also expected to generate annualized cost synergies of $250 million in 2019.  This is in addition to the $100 million cost reduction program that CB&I expects to have fully implemented by the end of 2017 previously implemented.  The cost synergies are expected to come from operations optimization, G&A savings, supply chain optimization and other related cost savings.  Further, McDermott and CB&I expect that the transaction will lead to substantial revenue synergies due to the enhanced capabilities of the combined company.

- **Common attributes focused on safety and customer engagement.**  McDermott and CB&I's combined experience in delivering customer centric solutions and fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects for customers.  Further, their similar cultures will ensure safety remains the number one priority and will help facilitate a seamless transition for partners and employees worldwide

## Headquarters and Governance

Following completion of the transaction, the combined company will be headquartered in the Houston area.  David Dickson, current President and Chief Executive Officer of McDermott, will be President and Chief Executive Officer of the combined company, and Stuart Spence, current Executive Vice President and Chief Financial Officer of McDermott, will be Executive Vice President and Chief Financial Officer of the combined company.  Patrick Mullen,

President and Chief Executive Officer of CB&I, will remain with the combined company for a transition period to ensure a seamless integration. Operational leadership will include representatives from both companies.

The Board of Directors will be comprised of 11 members, including 10 independent directors and David Dickson. Five of the independent directors will come from McDermott and five will come from CB&I. Gary P. Luquette, Non-Executive Chair of the McDermott Board, will serve as the combined company's Non-Executive Chairman.

### Transaction Structure

The combination involves a series of transactions under Dutch law resulting in the sale of CB&I's entire business, as well as an exchange offer by McDermott in which CB&I's shareholders can tender their shares. Both the sale and the exchange offer will result in the same consideration for CB&I's shareholders (subject to tax consequences, including potential Dutch withholding taxes in respect of shareholders that do not participate in the exchange offer).

### Financing, Completion and Approvals

The combined company has secured approximately $6 billion of fully-committed financing, led by Barclays, Credit Agricole CIB and Goldman Sachs & Co. LLC., and it is expected that permanently funded debt financing in the form of term loans and unsecured bonds will be put into place prior to closing. The transaction has been approved by the Boards of both companies and is expected to be completed in the second quarter of 2018. It remains subject to regulatory antitrust approvals, approval by McDermott's and CB&I's shareholders and other customary closing conditions.

### CB&I Technology Business

The transaction includes CB&I's Technology business and former Engineered Products business, for which CB&I has obtained from its lender group various amendments to its debt covenants.

### Advisors

Goldman Sachs & Co. LLC and Greenhill & Co., LLC are serving as lead financial advisors to McDermott, and Barclays and Credit Agricole CIB are also serving as financial advisors. Moelis & Company LLC is advising McDermott on financing related to the transaction. Baker Botts L.L.P. is serving as legal counsel to McDermott and NautaDutilh N.V. is serving as legal counsel to McDermott in the Netherlands. Centerview Partners LLC is serving as the exclusive financial advisor to CB&I. Wachtell, Lipton, Rosen & Katz is serving

as legal counsel to CB&I and De Brauw Blackstone Westbroek N.V. is serving as legal counsel to CB&I in the Netherlands.

[***]

### About McDermott

McDermott is a leading provider of integrated engineering, procurement, construction and installation ("EPCI"), front-end engineering and design ("FEED") and module fabrication services for upstream field developments worldwide.  McDermott delivers fixed and floating production facilities, pipelines, installations and subsea systems from concept to commissioning for complex Offshore and Subsea oil and gas projects to help oil companies safely produce and transport hydrocarbons.  McDermott's customers include national and major energy companies.  Operating in approximately 20 countries across the world, McDermott's locally focused and globally integrated resources include approximately 12,000 employees, a diversified fleet of specialty marine construction vessels, fabrication facilities and engineering offices.  McDermott is renowned for its extensive knowledge and experience, technological advancements, performance records, superior safety and commitment to deliver.  McDermott has served the energy industry since 1923, and shares of its common stock are listed on the New York Stock Exchange.  As used in this press release, McDermott includes McDermott International, Inc. and its subsidiaries and affiliates.  To learn more, visit our website at www.mcdermott.com.

### About CB&I

CB&I (NYSE:CBI) is a leading provider of technology and infrastructure for the energy industry.  With more than 125 years of experience, CB&I provides reliable solutions to our customers around the world while maintaining a relentless focus on safety and an uncompromising standard of quality.  For more information, visit www.CBI.com.[2]

29.    The Merger Consideration CB&I stockholders stand to receive if the Proposed

Transaction is consummated is unfair and inadequate because, among other things, the intrinsic

value of the Company and its common stock is materially in excess of the amount offered given

_____

[2] Chicago Bridge & Iron Company N.V., Current Report (Form 8-K), at Exhibit 99.1 (Joint Press release, dated December 18, 2017) (Dec. 18, 2017).

the Company's prospects for future growth and earnings.  As a result, the Proposed Transaction will deny Class Members their right to fully share equitably in the true value of the Company.

30.     For example, on May 22, 2017, Deutsche Bank raised its price target[3] on CB&I to *$38.00* from $35.00, noting the Company's positive outlook, management changes, and overall improvement in the sector.[4]

31.     On June 28, 2017, the Delaware Supreme Court ruled in favor of CB&I in relation to a $2 billion lawsuit in connection to Westinghouse Electric Co.'s 2015 acquisition of CB&I's Shaw nuclear construction business.  In response, the Company saw its shares rise *over 39%* on the same day the ruling was announced,[5] and several investment banks revised their price targets. In fact, David Scott, an executive director at institutional equity research, sales, and trading company MKM Partners, reiterated his Buy rating with a *$34 price target*.[6]  Similarly, Wells Fargo upgraded its rating to "Outperform" with a *$28* price target.[7]

---

[3]  Price targets reflect an individual investment analyst's expectation on the future price of a stock.  While price targets can be calculated using a variety of valuation methods, price targets often can affect the price of the stock itself.  *See Price Target*, INVESTOPEDIA, *available at* https://www.investopedia.com/terms/p/pricetarget.asp?lgl=rira-layout-cpa-bsln.

[4]  *Chicago Bridge & Iron (CBI) PT Raised to $38 at Deutsche Bank Following CEO Retirement; 'Trump Trade Wash Out Creates Buying Opportunity in E&C'*, STREETINSIDER.COM (May 22, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Chicago+Bridge+%26+Iron+%28CBI%29+PT+Raised+to+%2438+at+Deutsche+Bank+Following+CEO+Retirement%3B+Trump+Trade+Wash+Out+Creates+Buying+Opportunity+in+E%26C/12930107.html.

[5]  *Chicago Bridge & Iron (CBI) Surges: Stock Moves 39% Higher June 28, 2017*, ZACKS (June 29, 2017), *available at* https://www.zacks.com/stock/news/265794/chicago-bridge-amp-iron-cbi-surges-stock-moves-39-higher.

[6]  Merrick Weingarten, *Surprise Positive News Continues To Lift Chicago Bridge & Iron Shares* (June 28, 2017), *available at* https://www.benzinga.com/analyst-ratings/analyst-color/17/06/9664456/surprise-positive-news-continues-to-lift-chicago-bridge-.

[7]  *CB&I scores a Well Fargo upgrade after positive legal decision*, SEEKING ALPHA (June 28, 2017), *available at* https://seekingalpha.com/news/3276048-cb-scores-wells-fargo-upgrade-positive-legal-decision.

32.     Furthermore, the implied value of the Merger Consideration proposed for each share of CB&I common stock (i.e., $18.76) represents ***approximately 55% discount*** to CB&I's closing price of $33.95 per share for the 52-week period ending December 15, 2017.

33.     In addition, the financial analyses conducted by Centerview, the Company's financial advisor, illustrates that the value of the Company's shares exceeds the Merger Consideration.  For example, Centerview's *Discounted Cash Flow Analysis* indicates an implied per share value range as high as ***$33.61***, which illustrates that each share of CB&I's common stock has an inherent premium of ***approximately 80%*** over the $18.76 implied value of the Merger Consideration.

34.     In sum, the Merger Consideration appears to inadequately compensate CB&I stockholders because, among other things, the intrinsic value of the Company's common stock is materially in excess of the Merger Consideration.  Given the Company's growth potential and its intellectual property, it appears that the Merger Consideration of 2.47221 shares of McDermott common stock in exchange for each share of CB&I is not fair compensation for CB&I stockholders.

35.     It is therefore imperative that CB&I public common shareholders receive the material information (discussed in detail below) that has been omitted from the S-4, which is necessary for the Company's public stockholders to properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.      The Merger Agreement's Deal Protection Provisions Deter Superior Offers**

36.      In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for CB&I.

37.      First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for CB&I shareholders.  Specifically, the Merger Agreement generally states that the Company and the Individual Defendants shall:  (i) immediately cease and terminate, and cause all of its and its subsidiaries' respective officers, directors, employees, investment bankers, consultants, attorneys, accountants, advisors, agents and other representatives to cease and terminate, any discussions or negotiations with any other person regarding any acquisition proposal; and (ii) promptly request, and cause to be requested, that each party that has received confidential information in connection with a possible acquisition proposal within the last 12 months return or destroy all confidential information heretofore furnished and promptly prohibit any access by any Person (other than Moon and its Representatives) to any physical or electronic data room relating to a possible acquisition proposal.[8]

38.      Furthermore, the Company and the Individual Defendants must promptly notify, orally or in writing, discovery of any proposals, indications of interest, and/or draft agreements received from other persons making an acquisition proposal.  *See id.* at 85.

---

[8]  McDermott International, Inc., Current Report (Form 8-K), at Exhibit 2.1, at *82-83 (Business Combination Agreement dated as of December 18, 2017 by and among McDermott International, Inc., McDermott Technology, B.V., McDermott Technology (Americas), LLC, McDermott Technology (US), LLC, Chicago Bridge & Iron Company N.V., Comet I B.V., Comet II B.V, CB&I Oil & Gas Europe B.V., CB&I Group UK Holdings, CB&I Nederland B.V. and The Shaw Group, Inc. †*) (Dec. 18, 2017).

39.     Additionally, the Merger Agreement grants McDermott recurring and unlimited matching rights, which provides it with four days to negotiate with CB&I, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.  *See id.* at 85-86.

40.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that McDermott can easily foreclose a competing bid.  As a result, these provisions unreasonably favor McDermott, to the detriment of CB&I's public common stockholders.

41.     The Merger Agreement also provides that CB&I must pay McDermott a termination fee of $60,000,000 under certain conditions, including in the event CB&I elects to terminate the Merger Agreement to pursue a superior proposal.  *See id.* at 110.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide CB&I stockholders with a superior offer.

42.     Ultimately, these preclusive deal protection provisions restrain CB&I's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

43.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that CB&I's public common stockholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

**III.     The Materially Incomplete and Misleading S-4**

44.     On January 23, 2018, McDermott filed the materially incomplete and misleading S-4 with the SEC.  The information contained in the S-4 has thus been disseminated to CB&I public common stockholders to solicit their vote in favor of the Proposed Transaction. Therefore, Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any materially misrepresentations or omissions.   However, the S-4 misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether or not to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

45.     Specifically, as set forth below, the S-4 fails to provide CB&I stockholders with material information or provides them with materially misleading information concerning: (i) financial projections for CB&I; (ii) financial projections for McDermott; (iii) financial projections for the Synergies; (iv) the valuation analyses performed by the CB&I's financial advisor, Centerview, in support of their fairness opinions; (v) the valuation analyses performed by the McDermott's Financial Advisors, in support of their fairness opinions; and (vi) the background process leading to the Proposed Transaction.

### *Material Omissions Concerning CB&I's Financial Projections*

46.     With respect to CB&I's financial projections, which were prepared by CB&I, the S-4 provides several non-GAAP financial metrics, including Adjusted EBITDA and Unlevered Free Cash Flow, for CB&I but fails to provide the line item projections detailed below for the metrics used to calculate these non-GAAP measures.

47.     The S-4 defines Adjusted EBITDA as "earnings before interest, taxes, depreciation and amortization, and was calculated treating stock-based compensation as an expense and adjusted for the estimated value of net income attributable to non-controlling interests, the exclusion of the Capital Services business and certain project charges incurred in 2017."   S-4 109.   However, the S-4 fails to provide values for: (i) interest; (ii) taxes; (iii) depreciation and amortization; (iv) stock-based compensation; (v) net income attributable to non-controlling interests; and (v) Capital Services business and certain project charges incurred in 2017.

48.     The S-4 defines Unlevered Free Cash Flow as "Adjusted Income From Operations less provision for income taxes plus depreciation and amortization minus the increase in net working capital or plus the decrease in net working capital minus capital expenditures and adjusted for the cash flow impact from equity investment earnings and certain other items."   *Id.* However, the S-4 fails to disclose values for: (i) income taxes; (ii) depreciation and amortization; (iii) net working capital; (iv) capital expenditures; and (v) cash flow impact form equity investment earnings and certain other items.

### *Material Omissions Concerning McDermott's and the Synergies Financial Projections*

49.     With respect to McDermott's financial projections, which were prepared by McDermott and utilized by CB&I and Centerview, the S-4 provides several non-GAAP financial metrics, including EBITDA and Free Cash Flow, but fails to provide the line item projections detailed below for the metrics used to calculate these non-GAAP measures.

50.     The S-4 defines EBITDA as "net income plus depreciation and amortization, interest expense, net, and provision for income taxes."   S-4 107.   However, the S-4 fails to

provide values for: (i) net income; (ii) depreciation and amortization; (iii) interest expense; and (iv) income taxes.

51.     The S-4 defines Unlevered Free Cash Flow as "operating cash flows less capital expenditures plus proceeds from disposal of assets but not including proceeds from disposition of principal business units."  *Id.*  However, the S-4 fails to disclose values for: (i) capital expenditures; (ii) proceeds from disposal of assets; and (iii) proceeds from disposition of principal business units.

52.     The omission of the above-referenced projections renders the financial projections included on pages 105 through 107 of the S-4 materially incomplete and misleading.  If a registration statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

53.     Moreover, the S-4 fails to provide disclose McDermott's unlevered free cash flow[9] projections for the years 2018 through 2022.  *See* S-4 105-107.  McDermott's unlevered free cash flows are material to CB&I's stockholders.  Indeed, McDermott's Financial Advisors specifically utilized McDermott's unlevered free cashflows in their discounted cash flow valuations.  *See* S-4 74, 87.  Moreover, in a merger transaction, accurate financial information is necessary in order for a shareholder fairly to be able to vote, and perhaps nothing is more

---

[9]  Unlevered free cash flows are used to determine a company's enterprise value.  The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure.  This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall.  For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

relevant to a vote on whether or not to approve a merger than the earnings picture of the acquiring company, particularly to the stockholder of the company being acquired. Without McDermott's unlevered free cash flow projections, the Company's stockholders will not be able to make a fully informed decision regarding whether to vote in favor of the Proposed Transaction.

54.     Furthermore, EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.  As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.  Simply put, the unlevered free cash flow projections are material and their omission renders the projections included in the S-4 misleading.

55.     Finally, the S-4 fails to provide disclose the Synergies, despite the fact that Centerview, in addition to McDermott's Financial Advisors, utilized the Synergies when conducting their financial valuations and rendering their fairness opinions.  As discussed above, accurate financial information is necessary in order for a shareholder fairly to be able to vote. Similarly, information concerning the earnings picture of the post-close, combined business

entity is equally relevant to CB&I stockholders who are being asked to vote on whether or not to vote their shares in favor of the Proposed Transaction.

56.     Moreover, complete disclosure of the above-mentioned information omitted from the financial projections is particularly important for CB&I public common stockholders in light of the fact that the Merger Consideration is stock in another company.

### Material Omissions Concerning Centerview's Financial Analyses

57.     The S-4 describes Centerview's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Centerview's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, CB&I's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Centerview's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to CB&I's public common stockholders

58.     With respect to Centerview's *Discounted Cash Flow Analysis*, the S-4 fails to disclose the following key components used in the analysis: (i) McDermott's standalone unlevered, after-tax free cash flows during the year ending December 31, 2018, through the year ending December 31, 2022; (ii) CB&I's net operating loss carryforwards ("NOL's"); (iii) the inputs and assumptions underlying the calculation of CB&I's enterprise value exit multiples ranging from 6.0 to 8.5x; (iv) the inputs and assumptions underlying the calculation of McDermott's enterprise value exit multiples ranging from 6.0 to 7.0x; (v) the inputs and assumptions underlying the calculation of CB&I's discount rates ranging from 9.5% to 10.5%; (vi) the inputs and assumptions underlying the calculation of McDermott's discount rates ranging

from 11.0% to 12.0%; (vii) the estimated present value of CB&I's estimated NOL's for the years ending December 31, 2018, through December 31, 2028; (viii) the inputs and assumptions underlying the calculation of CB&I's NOL's discount rate of 10.5%; (ix) the unlevered-free cash flow Synergies that are expected to generate during the year ending December 31, 2018, through the year ending December 31, 2022; (xii) the inputs and assumptions underlying the calculation of enterprise value exit multiples ranging from 6.0 to 8.5x that were applied the Cost Synergies; (xiii) the inputs and assumptions underlying the calculation of discount rates ranging from 9.5% to 10.5% that were applied to the Cost Synergies; and (xiv) the net present value of CB&I's standalone U.S net operating losses.

59.     These key inputs are material to CB&I public common stockholders, and their omission renders the summary of Centerview's *Discounted Cash Flow Analysis* incomplete and misleading.  As a highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…." *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….* This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices****.* The substantial discretion and lack of guidelines and standards also makes the process

vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

60.     With respect to Centerview's *Selected Public Comparable Companies Analysis*, the S-4 fails to disclose the individual multiples Centerview calculated for each company utilized.  The omission of these multiples renders the summary of the analysis and the average enterprise value and implied values per share of CB&I and McDermott misleading.  A fair summary of *Selected Public Comparable Companies Analysis* requires the disclosure of the individual multiples for each company; merely providing the median and average values that a banker applied is insufficient, as CB&I's stockholders unable to assess whether the banker applied appropriate multiples or, instead, applied unreasonably low multiples in order to drive down the Company's value.

61.     Similarly, with respect to Centerview's *Selected Precedent Transactions Analysis*, the S-4 fails to disclose the individual multiples Centerview calculated for each transaction considered.  For the same reasons mentioned above, this renders the summary of the analysis and the average enterprise value and implied values per share of CB&I and McDermott misleading.

62.     With respect to Centerview's *Analyst Price Target Analysis*, the S-4 fails to disclose the identities of the research analyst reports, the number of reports reviewed, and the individual price targets for each analyst report.  Failure to disclose this information forces CB&I's stockholders to blindly rely on analysts that were considered simply because Centerview found them satisfactory.  Accordingly, the misleading information should be addressed by providing the identities of the research analyst reports, the number of reports reviewed, and the individual price targets for each analyst report.

*Material Omissions Concerning McDermott's Financial Advisors Financial Analyses*

63.     With respect to Goldman Sachs' *Discounted Cash Flow Analysis CB&I Standalone*, the S-4 fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the calculation of the discount rates ranging from 10.0% to 12.0%; (ii) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 1.0% to 3.0%; and (iii) CB&I's net debt as of September 30, 2017.

64.     With respect to Goldman Sachs' *Discounted Cash Flow Analysis McDermott Standalone*, the S-4 fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the calculation of the discount rates ranging from 12.0% to 15.0%; (ii) McDermott's unlevered free cash flows for the final quarter of 2017 and for the fiscal years ending December 31, 2018, through December 31, 2022; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 1.5% to 3.5%; and (iv) McDermott's net debt as of September 30, 2017.

65.     With respect to Goldman Sachs' *Discounted Cash Flow Analysis Combined Company (Excluding Cash Tax Step-Up Benefits)*, the S-4 fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the calculation of the discount rates ranging from 11.5% to 13.5%; (ii) the combined company's unlevered free cash flows for the final quarter of 2017 and for the fiscal years ending December 31, 2018, through December 31, 2022; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 1.5% to 3.5%; and (iv) the combined company's net debt as of September 30, 2017.

66.     With respect to Goldman Sachs' *Selected Companies Analysis*, the S-4 fails to disclose the individual multiples Goldman Sachs calculated for each company evaluated.

67.     With respect to Greenhill's *Discounted Cash Flow Analysis*, the S-4 fails to disclose the following key components used in the analysis: (i) McDermott's unlevered free cash flows for the during years ending December 31, 2018 through December 31, 2022; (ii) CB&I's unlevered free cash flows for the during years ending December 31, 2018 through December 31, 2022; (iii) CB&I's net operating loss carryforwards; (iv) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 2.00% to 3.00%; (v) for McDermott, the inputs and assumptions underlying the calculation of the discount rates ranging from 12.0% to 14.0%; and (vi) for CB&I, the inputs and assumptions underlying the calculation of the discount rates ranging from 10.75% to 12.75.0%.

68.     With respect to Greenhill's *Selected Comparable Company Analysis*, the S-4 fails to disclose the individual multiples Greenhill calculated for each company evaluated.

69.     Likewise, with respect to Greenhill's *Sum of the Parts Analysis*, the S-4 fails to disclose the individual multiples Greenhill calculated for each company considered.

70.     For the reasons mentioned above, the failure to disclose the key inputs and individual multiples renders Goldman Sachs' *Discounted Cash Flow Analysis CB&I Standalone*, *Discounted Cash Flow Analysis McDermott Standalone*, *Discounted Cash Flow Analysis Combined Company (Excluding Cash Tax Step-Up Benefits)*, and *Selected Companies Analysis* and Greenhill's *Discounted Cash Flow Analysis*, *Selected Comparable Company Analysis*, and *Sum of the Parts Analysis* materially incomplete and misleading.

### *Material Omissions Concerning the Sales Process*

71.     The S-4 also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction.

72.     The S-4 fails to expressly indicate whether the confidentiality agreements CB&I entered into with potential acquirers contained standstill provisions that are still in effect and/or "don't ask, don't waive" restrictions that are presently precluding these parties from making a topping bid for the Company.   Such information is material to CB&I stockholders as a reasonable CB&I stockholder would find it material and important to their voting decision whether or not parties that had previously been interested in a potential acquisition of the Company are now foreclosed from submitting superior proposals.

73.     Defendants' failure to provide CB&I stockholders with the foregoing material information renders the statements in the *Background of the Combination* section of the S-4 false and/or materially misleading.

74.     In sum, the omission of the above-referenced information renders the S-4 materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

75.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

77.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

78.     The omission of information from a registration statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

79.     Defendants have issued the S-4 with the intention of soliciting CB&I's public common stockholders' support for the Proposed Transaction.  Each Defendant reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things: (i) financial projections for CB&I; (ii) financial projections for McDermott; (iii) financial projections for the Synergies; (iv) the valuation analyses performed by the CB&I's financial advisor, Centerview, in support of their fairness opinions; (v) the valuation analyses performed by the McDermott's Financial Advisors, in support of their fairness opinions; and (vi) the background process leading to the Proposed Transaction.

80.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but

failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to CB&I's public common stockholders although they could have done so without extraordinary effort.

81.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Centerview reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Centerview, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Centerview's analyses in connection with their receipt of the fairness opinions, question Centerview as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the S-4, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

82.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Transaction Agreement and the preparation of the Company's financial projections.

83.     CB&I is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

84.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

85.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

86.     The Individual Defendants acted as controlling persons of CB&I within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of CB&I, and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

89.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

92.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the common shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  January 29, 2018.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Attorneys for Plaintiff*

**OF COUNSEL:**

Juan E. Monteverde
Miles D. Schreiner
**MONTEVERDE & ASSOCIATES PC**
350 Fifth Avenue, Suite 4405
New York, NY  10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email:  jmonteverde@monteverdelaw.com
        mschreiner@monteverdelaw.com