# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

IN RE CHICAGO BRIDGE & IRON
COMPANY N.V., SECURITIES
LITIGATION

Lead Case No. 4:18-cv-0273

JURY TRIAL DEMAND

CLASS ACTION


## MEMORANDUM OF LAW IN SUPPORT OF INTERIM LEAD
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**KENDALL LAW GROUP, PLLC**
Joe Kendall
Jamie J. McKey
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel: (214) 744-3000
Fax: (214) 744-3015

*Local Counsel for Interim Lead Plaintiff*

Dated: March 16, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

ISSUE BEFORE THE COURT......................................................................................................4

SUMMARY OF ARGUMENT ......................................................................................................4

ARGUMENT .................................................................................................................................. 5

    I.      LEAD PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS
           ON THE MERITS OF ITS CLAIMS ................................................................... 5

           A.      Material Omissions Concerning CB&I's and McDermott's Financial
                  Projections.................................................................................................... 7

           B.      Material Omissions Concerning the Bankers' Market-Based Analyses... 11

           C.      Material Omissions Concerning the Background Leading to the Proposed
                  Transaction................................................................................................. 14

    II.     LEAD PLAINTIFF AND CB&I'S OTHER SHAREHOLDERS WILL SUFFER
           IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION .......... 16

    III.    THE HARM TO LEAD PLAINTIFF AND CB&I SHAREHOLDERS
           OUTWEIGHS ANY HYPOTHETICAL HARM TO DEFENDANTS ............... 17

    IV.    GRANTING TEMPORARY RELIEF WOULD SERVE THE PUBLIC
           INTEREST......................................................................................................... 18

CONCLUSION............................................................................................................................. 19

# TABLE OF AUTHORITIES

**CASES**

*Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*,
    Case No.: SACV 14-1214, 2014 U.S. Dist. LEXIS 156227 (C.D. Cal. Nov. 4, 2014) ........... 17

*In re Appraisal of the Orchard Enters.*,
    C.A. No. 5713-CS, 2012 Del. Ch. LEXIS 165 (Del. Ch. July 18, 2012).................................. 14

*Arnold v. Soc'y for Sav. Bancorp*,
    650 A.2d 1270 (Del. 1994)..................................................................................................... 14

*In re Art Tech. Grp., Inc. S'holders Litig.*,
    C.A. No. 5955-VCL, 2010 Del. Ch. LEXIS 257 (Del. Ch. Dec. 21, 2010)............................. 19

*AT&T Co. v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir. 1994).................................................................................................... 18

*In re BioClinica, Inc. S'holder Litig.*,
    C.A. No. 8272-VCG, 2013 Del. Ch. LEXIS 52 (Del. Ch. Feb. 25, 2013)............................... 11

*Brown v. Brewer*,
    Case No. CV 06-3731-GHK, 2008 U.S. Dist. LEXIS 108904 (C.D. Cal. July 14, 2008).......... 6

*Brown v. Brewer*,
    Case No. CV 06-3731-GHK, 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) ........... 7

*Canal Authority of State of Florida v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) .................................................................................................... 5

*In re Celera Corp. S'holder Litig.*,
    Civil Action No. 6304-VCP, 2012 Del. Ch. LEXIS 66 (Del. Ch. Mar. 23, 2012) .............. 9, 12

*In re Cendant Corp. Litig.*,
    60 F. Supp. 2d 354 (D.N.J. 1999) ............................................................................................ 6

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*,
    569 F.2d 300 (5th Cir. 1978).................................................................................................. 18

*David P. Simonetti Rollover IRA v. Margolis*,
    C.A. No. 3694-VCN, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008) ................................ 8

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996)........................................................................................................ 19

*Gearhart Indus. v. Smith Int'l*,
741 F.2d 707 (5th Cir. 1984) .................................................................. 6

*Gen. Steel Indus., Inc. v. Walco Nat'l Corp.*,
No. 81-1410-C, 1981 U.S. Dist. LEXIS 16932 (E.D. Mo. Nov. 24, 1981) ............................. 17

*General Electric Co. v. Cathcart*,
980 F.2d 927 (3d Cir. 1992) .................................................................. 6

*Gould v. American- Hawaiian S.S. Co.*,
535 F.2d 761 (3d Cir. 1976) .................................................................. 6

*In re Hot Topic Sec. Litig.*,
CV 13-02939, 2014 U.S. Dist. LEXIS 180513 (C.D. Cal. May 2, 2014) ................................ 8

*Int'l Controls Corp. v. Vesco*,
490 F.2d 1334 (2d Cir. 1974) ................................................................. 19

*Krauth v. Executive Telecard, Ltd.*,
890 F. Supp. 269 (S.D.N.Y. 1995) ............................................................. 17

*La. Mun. Police Emples. Ret. Sys. v. Crawford*,
C.A. No. 2635-N, 2007 Del. Ch. LEXIS 28 (Del. Ch. Feb. 13, 2007) ................................ 19

*Lakedreams v. Taylor*,
932 F.2d 1103 (5th Cir. 1991) ............................................................... 4, 5

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
148 F. Supp. 2d 1141 (D. Kan. 2001) ........................................................ 17, 18

*Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*,
11 A.3d 1175 (Del. Ch. 2010) ............................................................... 8, 10

*Marx v. Computer Scis. Corp.*,
507 F.2d 485 (9th Cir. 1974) .................................................................. 7

*Med. Imaging Ctrs. Of Am., Inc. v. Lichtenstein*,
917 F. Supp. 717 (S.D. Cal. 1996) ........................................................... 17

*Mid-Continent Bancshares, Inc. v. O'Brien*,
No. 81-1395-C, 1981 U.S. Dist. LEXIS 17419 (E.D. Mo. Dec. 11, 1981) ............................. 18

*Mills v. Electric Auto-Lite Co.*,
396 U.S. 375 (1970) .......................................................................... 6

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ............................................................................ 5

*In re Netsmart Techs., Inc. S'holders Litig.*,
    924 A.2d 171 (Del. Ch. 2007) ................................................................ 7, 10, 11

*Owen v. Cannon*,
    C.A. No. 8860-CB, 2015 Del. Ch. LEXIS 165 (Del. Ch. June 17, 2015) ................................. 10

*Phototron Corp. v. Eastman Kodak Co.*,
    687 F. Supp. 1061 (N.D. Tex. 1988) ..................................................................... 17

*Polaroid Corp. v. Disney*,
    862 F.2d 987 (3rd Cir. 1988) .......................................................................... 16

*In re Pure Res., Inc. S'holders Litig.*,
    808 A.2d 421 (Del. Ch. 2002) .............................................................. 10, 11, 14

*In re Radiology Assocs., Inc.*,
    611 A.2d 485 (Del. Ch. 1991) ......................................................................... 12

*Rosenblatt v. Getty Oil Co.*,
    493 A.2d 929 (Del. 1985) .............................................................................. 8

*In re Rural Metro Corp. Stockholders Litig.*,
    88 A.3d 54 (Del. Ch. 2014) ........................................................................... 12

*Smith v. Robbins & Myers*,
    969 F. Supp. 2d 850 (S.D. Ohio 2013) ............................................................... 7, 12

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.*,
    483 F.2d 247 (2d Cir. 1973) .......................................................................... 17

*In re Tele-Comms., Inc. S'holders Litig.*,
    C.A. No. 16470, 2005 Del. Ch. LEXIS 206 (Del. Ch. Dec. 21, 2005) ...................................... 8

*Temple Univ. v. Write*,
    941 F.2d 201 (3d Cir. 1991) .......................................................................... 19

*In re Topps Co. S'holders Litig.*,
    926 A.2d 58 (Del. Ch. 2007) .......................................................................... 10

*TSC Indus. Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ............................................................................. 6, 7, 8

*Zirn v. VLI Corp.*,
   681 A.2d 1050 (Del. 1996).........................................................................................15

**DOCKETED CASES**

*In re Ancestry.com Inc. S'holder Litig.*,
   Consol. C.A. No 7988-CS (Del. Ch. Dec. 17, 2012) ...............................................15

*Turberg v. ArcSight*,
   C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011).......................................................12

**STATUTES**

Fed. R. Civ. P. 65 ..............................................................................................................5

**OTHER AUTHORITIES**

Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, at
   68 (1993) .................................................................................................................14

Chair Mary Jo White, *Keynote Address, International Corporate Governance Network Annual
   Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity,
   Non-GAAP, and Sustainability* (June 27, 2016), www.sec.gov/news/speech/chair-white-icgn-
   speech.html#_ftnref38...............................................................................................8

Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and
   Mergers & Acquisitions* (2d ed. 2013) ...................................................9, 10, 12, 14

## NATURE AND STAGE OF THE PROCEEDINGS

Interim Lead Plaintiff, The George Leon Family Trust and GrowthQuest Capital Inc. (collectively, "Lead Plaintiff"), respectfully submits this Memorandum of Law in support of its Motion to enjoin the yet-to-be-scheduled shareholder vote with respect to the proposed acquisition of Chicago Bridge & Iron Company N.V. ("CB&I" or the "Company") and its affiliates[1] by McDermott International, Inc. ("McDermott") and its affiliates[2] (the "Proposed Transaction") until Defendants[3] disclose publicly the material information omitted from the amended Registration Statement, which includes a Joint Proxy Statement/Prospectus, filed with the U.S. Securities and Exchange Commission ("SEC") on Form S-4/A on March 2, 2018 (the "Registration Statement").[4] Under the terms of the Agreement and Plan of Merger between Chicago Bridge and McDermott International (the "Merger Agreement"), if the Proposed Transaction is approved by CB&I's and McDermott's stockholders, CB&I's stockholders will receive 2.47221 shares of McDermott common stock for each share of CB&I they own, or, if McDermott effects a planned 3-to-1 reverse stock split prior to the closing of the Proposed Transaction, CB&I's stockholders will receive 0.82407 shares of McDermott common stock (the

---

[1] CB&I's affiliates are Comet I B.V., Comet II B.V., CB&I Oil & Gas Europe B.V., CB&I Group UK Holdings, CB&I Nederland B.V., and The Shaw Group, Inc. (collectively with CB&I, "Chicago Bridge").

[2] McDermott's affiliates are McDermott Technology, B.V. ("McDermott Bidco"), McDermott Technology (Americas), LLC, and McDermott Technology (US), LLC. (collectively with McDermott, "McDermott International").

[3] "Defendants" include Chicago Bridge; the members of CB&I's Board of Directors (the "Board"), L. Richard Flury ("Flury"), Forbes I.J. Alexander ("Alexander"), James R. Bolch ("Bolch"), Deborah M. Fretz ("Fretz"), W. Craig Kissel ("Kissel"), Larry D. McVay ("McVay"), James H. Miller ("Miller"), and Marsha C. Williams ("Williams"); and McDermott International.

[4] The March 2, 2018 amended Registration Statement is attached as Exhibit A to the Declaration of Timothy J. MacFall in Support of Interim Lead Plaintiff's Motion for a Preliminary Injunction (the "MacFall Decl.").

"Merger Consideration"). ¶ 3.[5]

Lead Plaintiff alleges that Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated under §14(a) of the Exchange Act, by issuing the materially incomplete and misleading statements in a Registration Statement, which recommends that CB&I shareholders vote in favor of the Proposed Transaction, to be filed with the SEC. ¶ 5. Specifically, the Registration Statement omits or misrepresents material information concerning, among other things: (i) the financial projections of CB&I and McDermott; (ii) the valuation analyses performed by CB&I's financial advisor in connection with the Proposed Transaction, Centerview Partners LLC ("Centerview"), and McDermott's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Greenhill & Co., LLC ("Greenhill"); and (iii) the background process leading to the Proposed Transaction. ¶¶ 46-76.

The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as shareholders need such information prior to the shareholder vote so they can properly exercise their corporate suffrage rights. Lead Plaintiff and CB&I's other stockholders will suffer irreparable harm if they are forced to make a voting decision on the Proposed Transaction without being provided with all material information.

<u>STATEMENT OF FACTS</u>

Founded in 1889, CB&I provides a wide range of services, including conceptual design, technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management, and environmental services to customers in the energy

---

[5] All references to "¶ _" are to the Consolidated Complaint for Violation of the Securities Exchange Act of 1934 ("Complaint") filed in this consolidated action on March 9, 2018. The Complaint is attached as Exhibit B to the MacFall Decl. To the extent capitalized terms are not defined herein, they shall have the same meaning as set forth in the Complaint.

infrastructure market throughout the world, and is a provider of diversified government services. ¶ 38. CB&I has approximately 42,100 employees worldwide, and has active projects in process in more than 70 countries. *Id.*

On December 31, 2015, CB&I completed the sale of its nuclear power construction business, previously included within its Engineering & Construction operating group, to Westinghouse Electric Company LLC for approximately $161.0 million. ¶ 39. The Company currently operates in four groups, which represent CB&I's reportable segments: Engineering & Construction; Fabrication Services; Technology; and Capital Services. ¶¶ 40-43.

On December 18, 2017, the Board caused CB&I to enter into the Merger Agreement with McDermott International, pursuant to which McDermott International and the Company will combine their businesses by a series of transactions, beginning with McDermott Bidco launching an offer to exchange any and all of CB&I's common stock for 2.47221 shares of McDermott common stock, or, if McDermott effects the 3-to-1 reverse stock split prior to the closing of the Proposed Transaction, 0.82407 shares of McDermott common stock. ¶ 44. Upon closing of the Proposed Transaction, McDermott stockholders will own approximately 53% of the outstanding shares of McDermott common stock and CB&I shareholders will own approximately 47% of the outstanding shares of McDermott common stock. ¶ 45.

Prior to the approval of the Proposed Transaction, CB&I's financial advisor, Centerview, and McDermott's financial advisors, Goldman Sachs and Greenhill, performed several valuation analyses, including comparable companies, precedent transactions, and discounted cash flow analyses, to support their respective opinions that the Merger Consideration was financially fair to CB&I's and McDermott's respective stockholders. ¶¶ 48-68; Ex. A, pp. 72-107. Prior to approving the Proposed Transaction, CB&I's and McDermott's respective Boards reviewed their

bankers' analyses and purportedly have relied upon the bankers' fairness opinions to support the approval of the Proposed Transaction. Ex. A, pp. 66-68.

In connection with the Proposed Transaction, Defendants filed a Form S-4 Registration Statement with the SEC, which was subsequently amended in a Form S-4/A filed with the SEC on March 2, 2018. Ex. A. The Registration Statement solicited stockholder approval of the Proposed Transaction, and, among other things, provided an account of the events leading to the execution of the Merger Agreement, provided certain financial projections of CB&I and McDermott, and summarized the valuation analyses conducted by CB&I's and McDermott's respective financial advisors in connection with the Proposed Transaction.

## ISSUE BEFORE THE COURT

The issue before the Court is whether the Proposed Transaction should be enjoined because Defendants failed disclose material information, identified below, that was necessary in order to make statements contained in the Registration Statement not false or misleading. The standard of review that governs the decision to grant or deny a preliminary injunction is abuse of discretion, but whether the court applied the correct legal standard is subject to *de novo* review. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991).

## SUMMARY OF ARGUMENT

The Court should grant Lead Plaintiff's Motion for a Preliminary Injunction because Defendants have omitted or mispresented material information in the Registration Statement which will prevent Lead Plaintiff and CB&I's other stockholders from making a fully informed vote with respect to the Proposed Transaction. Without this material information, Lead Plaintiff and CB&I's other stockholders will suffer irreparable harm, which outweighs any harm to Defendants if the limited injunction is granted. Further, the issuance of the preliminary

injunction will not disserve, but benefit, the public interest by protecting CB&I stockholders' franchise rights and requiring Defendants to comply with the disclosure requirements of the Exchange Act and the regulations promulgated thereunder.

**ARGUMENT**

Pursuant to Rule 65 of the Federal Rule of Civil Procedure, the Court may enter a preliminary injunction enjoining the Proposed Transaction until Defendants disclose publicly all material information necessary to allow CB&I shareholder to make an informed voting decision with respect to the Proposed Transaction. In determining whether to grant a preliminary injunction, a court must consider whether the party seeking the injunction has established four factors:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Mississippi Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 621 (5th Cir. 1985) (quoting *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)). "The decision to grant or deny a preliminary injunction lies within the discretion of the district court." *Lakedreams*, 932 F.2d at 1107 (citation omitted).

**I.     LEAD PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS**

Lead Plaintiff alleges that Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing the materially incomplete and misleading Registration Statement. To state a claim under Section 14(a), "a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential

link in the accomplishment of the transaction.'" *General Electric Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970)).[6]

Here, Lead Plaintiff alleges that the Registration Statement contained material misrepresentations and omissions in violation of §14(a) of the Exchange Act and Rule 14a-9, which prevents CB&I shareholders from making a fully informed vote on the Proposed Transaction. Ex. B at ¶¶ 77-84. Lead Plaintiff, therefore, satisfies the second and third prongs of the *General Electric* standard because: Lead Plaintiff alleges injury to itself and the class (*Gearhart Indus. v. Smith Int'l*, 741 F.2d 707, 716 (5th Cir. 1984) (affirming grant of preliminary injunction to allow corrective disclosure because reasonable shareholder likely to be misled in deciding whether to tender shares)); and the materially false and misleading Registration Statement is an "essential link" in obtaining shareholder approval of the Proposed Transaction. *Brown v. Brewer*, Case No. CV 06-3731-GHK, 2008 U.S. Dist. LEXIS 108904, at *21 (C.D. Cal. July 14, 2008).

With respect to the first prong of the *General Electric* standard, for a non-disclosure to constitute a violation under the Exchange Act and Rule 14a-9, the omitted fact must be "material." An omission or misleading statement of fact is material "if there is a substantial likelihood that a responsible shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A plaintiff need not prove "a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *Id.* Rather, a plaintiff must only show "a substantial likelihood

---

[6] Negligence is the standard of culpability under Section 14(a), not the heightened pleading standards imposed by the Private Securities Litigation Reform Act. *See In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 377 (D.N.J. 1999) (citing *Gould v. American- Hawaiian S.S. Co.*, 535 F.2d 761, 777 (3d Cir. 1976)). This negligence standard of liability also applies to non-management directors. *Id.*

that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* The materiality standard is an objective one, measured from the point of view of the reasonable investor, not from the subjective views of the companies and directors that issue the proxy statements. *Id.* at 445.

Here, the Registration Statement omits or misrepresents material information concerning: (a) the financial projections of CB&I and McDermott; (b) the valuation analyses performed by CB&I's financial advisor, Centerview, and McDermott's financial advisors, Goldman Sachs and Greenhill; and (c) the background process leading to the Proposed Transaction.

### A. Material Omissions Concerning CB&I's and McDermott's Financial Projections

Defendants failed to disclose material information relating to CB&I's and McDermott's financial projections, including the projected unlevered free cash flows underlying each of the banker's discounted cash flow analyses and, relatedly, the cost and tax synergies expected to result from the Proposed Transaction and the other line items used to calculate each company's projected non-GAAP unlevered free cash flows. ¶¶ 50-56. The full disclosure of a company's financial projections is plainly material information to stockholders because the projections are among the most significant factors relied upon by investors in valuing their stock.[7]

---

[7] *See Brown v. Brewer*, Case No. CV 06-3731-GHK, 2010 U.S. Dist. LEXIS 60863, at *71 (C.D. Cal. June 17, 2010) ("A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued."); *Marx v. Computer Scis. Corp.*, 507 F.2d 485, 489 (9th Cir. 1974); *Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013); *see also In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) ("[S]tockholders would obviously find it important to know

Although the Registration Statement purports to disclose CB&I's projected "unlevered free cash flow" and McDermott's "free cash flow" (*see* Ex. A, pp. 109, 111), it is apparent that these cash flows were not the actual projections used in each of the banker's discounted cash flow analyses. Nor does the Registration Statement disclose the line item projections of the unlevered free cash flows so that stockholders could calculate the free cash flows themselves.[8] The disclosure of these omitted projections is particularly important to stockholders because they were used by the financial advisors in their respective valuation analyses to support the purported fairness of the Merger Consideration.[9]

Specifically, with respect to CB&I's unlevered free cash flows, the Registration Statement indicates that, in Centerview's Discounted Cash Flow Analysis, CB&I's unlevered free cash flows were adjusted to exclude the cash impact of CB&I's net operating loss

what management and the company's financial advisor's best estimate of those future cash flows would be."); *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010); "Delaware follows the federal standard articulated in *TSC Industries v. Northway* for determining materiality," and those courts have had ample opportunity to expand on the law of disclosure as it relates to mergers and acquisitions in the fiduciary duty context. *In re Tele-Comms., Inc. S'holders Litig.*, C.A. No. 16470, 2005 Del. Ch. LEXIS 206, at *13 (Del. Ch. Dec. 21, 2005); *see also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).

[8] The disclosure of the line item projections underlying the CB&I's and McDermott's free cash flow and EBITDA projections are important to stockholders because those projections are non-GAAP measures that lack a uniform definition and therefore carry the risk of misleading investors. *See* Chair Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), www.sec.gov/news/speech/chair-white-icgn-speech.html#_ftnref38.

[9] *See David P. Simonetti Rollover IRA v. Margolis*, C.A. No. 3694-VCN, 2008 Del. Ch. LEXIS 78, at *30 (Del. Ch. June 27, 2008) ("The key assumptions made by a banker in formulating his opinion are of paramount importance to the stockholders because any valuation analysis is heavily dependent upon the projections utilized."); *In re Hot Topic Sec. Litig.*, CV 13-02939, 2014 U.S. Dist. LEXIS 180513, at *26-27 (C.D. Cal. May 2, 2014) (denying motion to dismiss because defendants failed to disclose certain projections that could "have revealed to the shareholders that the LRP Projections more accurately described the Company's intrinsic value").

carryforwards ("NOLs"), but the Registration Statement appears to disclose only the unadjusted set of unlevered free cash flows that were not actually used in Centerview's analysis. *See* Ex. A at 104 ("In the case of CB&I, the unlevered free cash flow was adjusted to exclude the cash impact of CB&I's net operating loss carryforwards, or NOLs."); *cf.* Ex. A, p. 111.[10] With respect to McDermott's unlevered free cash flows, the Registration Statement only discloses McDermott's "free cash flows" (Ex. A, p. 109), but it fails to disclose McDermott's "*unlevered free cash flows*" that were actually used in Centerview's analysis.[11] Ex. A, p. 104.

Further, the Registration Statement indicates that Centerview preformed an additional Discounted Cash Flow Analysis that took into account the cost and operating synergies (the "Cost Synergies") that are expected to result from the Proposed Transaction during the years 2018 through 2022, and the tax-related synergies forecasted to result from tax basis step-up

---

[10] The Registration Statement defined the disclosed Unlevered Free Cash Flow projections as "Adjusted Income From Operations less provision for income taxes plus depreciation and amortization minus the increase in net working capital or plus the decrease in net working capital minus capital expenditures and adjusted for the cash flow impact from equity investment earnings and certain other items." Ex. A, p. 111. "Adjusted EBITDA" is defined as "earnings before interest, taxes, depreciation and amortization, and was calculated treating stock-based compensation as an expense and adjusted for the estimated value of net income attributable to non-controlling interests, the exclusion of the Capital Services business and certain project charges incurred in 2017." *Id.*

The disclosure of the line item projections and the GAAP reconciliation is particularly material here because of the uncertainty as to whether stock-based compensation should be treated as a cash or non-cash expense in calculating a company's unlevered free cash flows, and courts have held that treating it as a cash expense (as was done here) is "unusual" and "uncommon." *In re Celera Corp. S'holder Litig.*, Civil Action No. 6304-VCP, 2012 Del. Ch. LEXIS 66, at *87-88 (Del. Ch. Mar. 23, 2012), *rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012). Notably, by treating stock-based compensation as a cash expense, Defendants lowered CB&I's unlevered free cash flow projections, which, in turn, lowered the valuation range for the Company in the bankers' Discounted Cash Flow Analyses.

[11] The disclosure of these projections is important because "[t]he projection of the target's *unlevered* [free cash flows] forms the core of a DCF." Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, 127 (2d ed. 2013) (hereafter, "Rosenbaum & Pearl, *Investment Banking*") (emphasis in original).

associated with the sale of CB&I's technology business for the 15-year period following the Proposed Transaction (the "Tax Synergies"), but it fails to disclose those projected Cost Synergies and Tax Synergies.[12]  *See* Ex. A, p. 104.

The disclosure of the foregoing information is necessary, because without it, stockholders cannot test the assumptions that were used by the bankers in their discounted cash flow analyses, which has been recognized as the valuation methodology "that merits the greatest confidence within the financial community."  *Owen v. Cannon*, C.A. No. 8860-CB, 2015 Del. Ch. LEXIS 165, at *47 (Del. Ch. June 17, 2015) (citations and internal quotation marks omitted); *see also Netsmart*, 924 A.2d at 203 ("Indeed, projections of this sort are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or (as already discussed) market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects.").  Further, Defendants must disclose this information to avoid misleading stockholders with respect to what projections the bankers actually relied upon.[13]

Notably, the failure to disclose financial projections in the merger context has sustained injunctive relief.  *See Netsmart*, 924 A.2d at 177 (Del. Ch. 2007); *Maric Capital*, 11 A.3d at

---

[12] Stockholders are entitled to understand the size of the expected synergies to determine whether they are receiving their fair share of that additional value.  Forecasted synergies and cost savings achieved as a result of a merger "represent tangible value to the acquirer in the form of future cash flow and earnings above and beyond what can be achieved by the target on a stand-alone basis."  Rosenbaum & Pearl, *Investment Banking*, at 104.  "Theoretically, higher synergies translate into a higher potential price that the acquirer can pay."  *Id*.  Moreover, the size of potential synergies and cost savings "plays an important role in framing purchase price, often representing the difference between meeting or falling short of internal investment return thresholds and shareholder expectations."  *Id*. at 333.  As such, this information is material to stockholders.

[13] *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002) (stating that when a disclosure document "ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of facts"); *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76-77 (Del. Ch. 2007).

1178; *see also In re BioClinica, Inc. S'holder Litig.*, C.A. No. 8272-VCG, 2013 Del. Ch. LEXIS 52, at *18 (Del. Ch. Feb. 25, 2013) ("Generally, the failure of a company to disclose management's financial projections in its proxy materials, when those projections have been relied on by a financial advisor to render a fairness opinion, is a material omission that will sustain injunctive relief if not corrected.").

**B.      Material Omissions Concerning the Bankers' Market-Based Analyses**

The financial advisor's analyses "usually address the most important issue to stockholders – the sufficiency of the consideration being offered to them for their shares in a merger or tender offer." *Pure Res.*, 808 A.2d at 449.  For this reason, "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers" when the bankers' financial analyses are relied upon by boards to approve merger transactions.  *Id.*  Thus, "when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed." *Netsmart*, 924 A.2d at 203-04. "Only providing some of that information is insufficient to fulfill the duty of providing a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the board as to how to vote . . . rely." *Id.* at 204.

The Registration Statement fails to disclose material information relating to Centerview's, Goldman Sachs', and Greenhill's respective comparable companies analyses, and Centerview's precedent transactions analysis.  ¶¶ 57-58, 63, 65.  The omitted information relating to these market-based analyses that were relied upon by the bankers to support their fairness opinions, and reviewed by the Boards of CB&I and McDermott prior to approving the Proposed Transaction is material to stockholders.  Thus, the full disclosure of this information is

material to stockholders. *See Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 872-873 (S.D. Ohio Aug. 27, 2013) (denying dismissal of disclosure claims relating to comparable companies and precedent transaction analyses); *see also In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 104-105 (Del. Ch. 2014) (finding the information in the proxy statement relating to the banker's precedent transaction analysis was false and misleading).

First, each of the banker's respective analyses fails to disclose the individual multiples of the companies or transactions observed by the bankers. *See* Ex. A, pp. 75-76, 85-87, 101-103. Fundamentally, these market-based analyses are "built upon the premise that similar companies [and transactions] provide a highly relevant reference point for valuing a given target." Rosenbaum & Pearl, *Investment Banking*, at 13. Thus, the disclosure of the observed multiples is necessary because the multiples are a crucial element of the comparable companies and precedent transactions analyses, as these analyses are based on comparison and relative valuation. *See In re Radiology Assocs., Inc.*, 611 A.2d 485, 490 (Del. Ch. 1991) ("The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison. At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes.") (citation omitted). As such, the multiples of each of the selected companies and transactions must be disclosed to stockholders.[14]

Second, each of the comparable companies and precedent transactions analyses

---

[14] *See e.g.*, *Celera Corp.*, 2012 Del. Ch. LEXIS 66, at *122 ("[A] fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions."); *Turberg v. ArcSight*, C.A. No. 5821-VCL, at 43 (Del. Ch. Sept. 20, 2011) (Transcript) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be on there, just like they're in there when you give them to the board . . . .  [Y]ou would never see a board book that would go to the board without the background multiples.").

performed by the bankers rely on financial projections of CB&I and/or McDermott that were not, but should have been, disclosed to stockholders. In particular, Centerview's Selected Public Comparable Companies Analysis relied on McDermott's 2018 and 2019 estimated *Adjusted* EBITDA. Centerview's Selected Precedent Transactions Analysis relied on McDermott's 2017 estimated *Adjusted* EBITDA. Goldman Sachs' Selected Companies Analysis of each of CB&I and McDermott relied on CB&I's 2018 and 2019 estimated EBITDA as used by Goldman Sachs in its analysis, and CB&I's and McDermott's book value. Greenhill's Selected Comparable Company Analysis of each of CB&I and McDermott relied on CB&I's and McDermott's 2018 and 2019 estimated "EBITDA" and "EBITDA—Capex." As noted, the projections underlying the financial advisors' analyses are important information to stockholders and must be disclosed.

Third, the Registration Statement also failed to disclose material information relating to certain questionable assumptions and methodologies used in both of Centerview's market-based analysis. In particular, with respect to Centerview's Selected Public Comparable Companies Analysis, the Registration Statement fails to disclose Centerview's basis for selecting and applying different multiples reference ranges to each of CB&I's and McDermott's relevant projections, which is unusual given the fact that Centerview relied upon the same "comparable" companies for each of CB&I and McDermott. Ex. A, p. 102.

With respect to Centerview's Selected Precedent Transactions Analysis, the Registration Statement indicates that the mean and median observed enterprise value to CY 2017 estimated Adjusted EBITDA multiples of the selected transactions were 9.9x and 10.3x, respectively. Ex. A, p. 103. In its analysis, however, Centerview selected a multiple reference range of 7.0x to 9.0x (which is wholly below the observed transactions' mean and median multiples) to apply to CB&I's CY 2017 estimated Adjusted EBITDA. *Id.* The Registration Statement failed to, but

must, disclose Centerview's basis for selecting a multiples reference range that was below the mean and median multiples of the selected transactions.[15]

The unusual way in which Centerview performed its Selected Public Comparable Companies Analysis and Selected Precedent Transactions Analysis suggests that either the companies or transactions selected by Centerview were not truly comparable, or that Centerview was simply "cherry picking" multiples to reach a particular conclusion.[16] Stockholders therefore are entitled to the full disclosure of these analyses so that they can assess the efficacy of the bankers' analyses, and make any adjustments to the analyses if they deem appropriate.

### C. Material Omissions Concerning the Background Leading to the Proposed Transaction

The Registration Statement also omits material information relating to the sale process leading up to the Proposed Transaction. ¶¶ 72-75. "[Stockholders] are entitled to a balanced and truthful recitation of events, not a sanitized version that is materially misleading." *Pure Res.*, 808 A.2d at 451. Moreover, "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . ., they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del. 1994). Significantly, "the disclosure of even a nonmaterial fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material

---

[15] In the precedent transactions (and the comparable companies) analysis, the "banker typically uses the mean and median multiples from the universe as a guide to establish a preliminary valuation range for the target." Rosenbaum & Pearl, *Investment Banking*, at 85.

[16] *See In re Appraisal of the Orchard Enters.*, C.A. No. 5713-CS, 2012 Del. Ch. LEXIS 165, at * 29 (Del. Ch. July 18, 2012) (stating that a party that "determines not to use either the median or the mean of the multiples derived from her sample, but instead picks a multiple that has no logical relation to either, that party is indicating that her comparables are in fact not at all very comparable"); Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, at 68 (1993) (noting that an investment bank that values a company using the market approach by employing the mean and median multiples generated by the comparables "is less likely to be accused of 'cherry picking' in order to reach a particular conclusion").

facts in order to prevent the initial disclosure from materially misleading the stockholders." *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

The Registration Statement indicates that CB&I entered into confidentiality agreements with "more than 30 potentially interested parties, including both strategic and financial buyers." Ex. A, pp. 59-60. The Registration Statement, however, fails to disclose the terms of the confidentiality agreements, including whether they contain standstill and/or "don't ask, don't waive" provisions that prohibit the counterparties from making an unsolicited superior proposal to CB&I. This information is material to stockholders, as they would find it important to understand that the Board has contractually precluded the Company from potentially receiving higher offers from third parties.

In *In re Ancestry.com Inc. S'holder Litig.*, Consol. C.A. No 7988-CS (Del. Ch. Dec. 17, 2012) (Transcript), the defendant directors disclosed that one party's confidentiality agreement contained a standstill provision, but the directors did not disclose that the standstill provision contained a "don't ask, don't waive" provision that prevented the counterparty from requesting a waiver of the standstill provision. The Delaware Court of Chancery enjoined the consummation of the challenged transaction pending an accurate disclosure of the existence and significance of the "don't ask, don't waive" provision. In so ordering, the Court stated:

> I think it would have created the false impression that any of the folks who signed the standstill could have made a superior proposal. That's not true. They could only make it by breaching the standstill. Because in order to make the superior proposal, you would have to request for a waiver, either directly or indirectly.

*Id.* at 26. Notably, it is likely that such provisions do exist because Section 7.5(a) of the Merger Agreement provides that CB&I and its affiliates shall "not grant any waiver or release under or knowingly fail to enforce any confidentiality, standstill or similar agreement entered into or amended during the 12 months immediately preceding the date of this Agreement in respect of a

proposed Comet Acquisition Proposal." Ex. A, pp. A-1-61. This information is particularly

important to stockholders, because several parties other than McDermott submitted offers for a

transaction with CB&I.

Relatedly, the Registration Statement fails to disclose the actual economic and other

terms proposed by each of the companies that submitted proposals to engage in a transaction

with CB&I. ¶ 74. Specifically, the Registration Statement indicates that, on September 27,

2017, CB&I received proposals from eight potential buyers of CB&I's technology business, and

on November 20, 2017, CB&I received three final proposals for a transaction with the Company.

Ex. A, pp. 60, 65. The Registration Statement, however, fails to disclose the details of each of

those proposals. CB&I's stockholders are entitled to understand what offers were made to and

rejected by CB&I so that they can assess for themselves whether the Proposed Transaction with

McDermott is the best transaction possible.

## II. LEAD PLAINTIFF AND CB&I'S OTHER SHAREHOLDERS WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION

Lead Plaintiff and CB&I's other public shareholders will be harmed irreparably if the

Court does not enjoin the shareholder vote until Defendants provide CB&I's shareholders with

the omitted material information.

> The theory of the [Williams] Act is that shareholders are unable to protect their
> interests fully in making [voting or tender] decisions if the tender offeror fails to
> provide all material information regarding the offer. Irreparable harm arises
> because of the difficulty of proving money damages in a suit based upon material
> misrepresentations by the tender offeror. While Congress has determined that
> accurate disclosure is important to shareholders, it would often be impossible for
> shareholders to prove that on the facts of their particular tender offer accurate
> disclosure would have affected their decision making in a particular way with
> concomitant quantifiable monetary loss. The inadequacy of a remedy at law and
> the importance that Congress has attached to accurate disclosure of material
> information establishes irreparable harm.

*Polaroid Corp. v. Disney*, 862 F.2d 987, 1006 (3rd Cir. 1988). It is well-established that the lack

of an adequate remedy at law in the form of monetary damages threatens stockholders with irreparable harm.[17]  Moreover, courts have voiced a "strong preference" for enjoining a merger and requiring corrective disclosures prior to the merger being consummated, rather than trying to "unscramble the eggs" after the merger is approved and fashioning a remedy of damages.[18]

Accordingly, Lead Plaintiff has established that it and CB&I's shareholders would suffer irreparable injury in the absence of injunctive relief designed to remedy any false or misleading information in the Registration Statement.

## III.   THE HARM TO LEAD PLAINTIFF AND CB&I SHAREHOLDERS OUTWEIGHS ANY HYPOTHETICAL HARM TO DEFENDANTS

While Lead Plaintiff and CB&I's shareholders will be harmed irreparably if Defendants do not disclose the material information that was omitted from the Registration Statement, Defendants will suffer little to no harm if they are required to make the disclosures.  Indeed, "[i]f the Court orders corrective disclosures, Defendants would only incur the expense of making those disclosures."  *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, Case No.: SACV 14-1214, 2014 U.S. Dist. LEXIS 156227, at *51 (C.D. Cal. Nov. 4, 2014).  "Such a filing would take a brief amount of time to prepare and file and would involve little expense. The hardship to defendant

---

[17] *See, e.g., Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 287 (S.D.N.Y. 1995) ("Irreparable injury results from the use of false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated.") (citation omitted); *Gen. Steel Indus., Inc. v. Walco Nat'l Corp.*, No. 81-1410-C, 1981 U.S. Dist. LEXIS 16932, at *9 (E.D. Mo. Nov. 24, 1981) ("The shareholders will be irreparably harmed unless an injunction is issued in that they are being asked to decide whether to tender, hold or sell their shares in the market without the full and accurate disclosure of the aforementioned material information."); *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250-51 (2d Cir. 1973); *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1145-50 (D. Kan. 2001).

[18] *Med. Imaging Ctrs. Of Am., Inc. v. Lichtenstein*, 917 F. Supp. 717, 720 (S.D. Cal. 1996); *Phototron Corp. v. Eastman Kodak Co.*, 687 F. Supp. 1061, 1071 (N.D. Tex. 1988) ("physical assets sold, and commercial arrangements permanently altered . . . [are] the sort of 'scrambled eggs' that cannot be 'unscrambled' through monetary damages"), *rev'd on other grounds*, 842 F.2d 95 (5th Cir. 1988).

should the injunction issue is thus minimal." *Lone Star Steakhouse & Saloon, Inc.*, 148 F. Supp. 2d at 1150. Further, depending on when the corrective disclosures are made, Defendants may not have to change or postpone the date of the stockholder vote on the Proposed Transaction. As such, the threatened injury to CB&I's stockholders outweighs the threatened harm, if any, to Defendants.

## IV. GRANTING TEMPORARY RELIEF WOULD SERVE THE PUBLIC INTEREST

Granting the preliminary injunction sought herein would benefit the public interest. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1444 (3d Cir. 1994). The Exchange Act embodies the public policy that investors be informed of all material facts relating to their decisions whether to exchange their securities in merger and acquisition transactions. Viewed in this light, the requested injunctive relief is doing no more than requiring Defendants to obey the law. *Mid-Continent Bancshares, Inc. v. O'Brien*, No. 81-1395-C, 1981 U.S. Dist. LEXIS 17419, at *33 (E.D. Mo. Dec. 11, 1981) ("[A]n injunction is in the public interest insofar as it is necessary to effectuate the policies of the Securities Exchange Act of 1934."). It cannot be in the public interest to deprive Lead Plaintiff and CB&I's other stockholders of their only viable remedy with respect to the Proposed Transaction, and the public has a cognizable interest in the administration of the laws and holding to account those who violate them. Accordingly, granting Lead Plaintiff's limited request for equitable relief is in the public interest.[19]

---

[19] Although a security bond is sometimes required as a condition to a court entering a preliminary injunction, courts have the discretion to waive the bond requirement. "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman*, *S.A.*, 569 F.2d 300, 303 (5th Cir. 1978)

## CONCLUSION

For the reasons set forth above, Lead Plaintiff respectfully requests that the Court preliminarily enjoin the shareholder vote on the Proposed Transaction until the material information discussed above is disclosed to CB&I's stockholders.

Dated: March 16, 2018

**KENDALL LAW GROUP, PLLC**

By: */s/ Joe Kendall*

**OF COUNSEL:**

Joe Kendall (Texas Bar No. 11260700)
jkendall@kendalllawgroup.com

**RIGRODSKY & LONG, P.A.**

Jamie J. McKey (Texas Bar No. 24045262)

Timothy J. MacFall

jmckey@kendalllawgroup.com

825 East Gate Blvd., Suite 300

3232 McKinney Avenue, Suite 700

Garden City, NY 11530

Dallas, TX 75204

Telephone: (516) 683-3516

Telephone: (214) 744-3000

Facsimile: (302) 654-7530

Facsimile: (214) 744-3015

tjm@rl-legal.com

*Local Counsel for Interim Lead Plaintiff*

*Interim Class Counsel*

---

(citations omitted). Indeed, many courts have found it appropriate to "dispense with security where there has been no proof of likelihood of harm to the party enjoined." *See, e.g.*, *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974); *see also La. Mun. Police Emples. Ret. Sys. v. Crawford,* C.A. No. 2635-N, 2007 Del. Ch. LEXIS 28 (Del. Ch. Feb. 13, 2007) (enjoining stockholder vote on a merger due to inadequate disclosures and not requiring that a bond be posted); *In re Art Tech. Grp.*, *Inc. S'holders Litig.*, C.A. No. 5955-VCL, 2010 Del. Ch. LEXIS 257 (Del. Ch. Dec. 21, 2010) (same). As Lead Plaintiff has shown, Defendants face no harm if this Court issues a temporary injunction, and requiring a bond from Lead Plaintiff will only result in additional hardship to Lead Plaintiff due to Defendants' actions. When a court considers whether to require a bond, it should balance the "equities of the potential hardships that each party would suffer as a result of a preliminary injunction." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996). Particularly, the court should consider "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Temple Univ. v. Write*, 941 F.2d 201, 219 (3d Cir. 1991) (citation omitted). Under the present circumstances, this Court should use its discretion to waive the bond for this temporary injunction order, particularly since Lead Plaintiff has brought this lawsuit in his representative capacity on behalf of the class of CB&I's stockholders.

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF

system on this 16th day of March, 2018, to all counsel of record.

*/s/Jamie J. McKey* _____
Jamie J. McKey
